UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No. 17-cr-396

       Plaintiff

   v.                                                        MEMORANDUM OPINION

Zachary Thomas McCauley,

       Defendant

## I.  INTRODUCTION

Before me is Defendant Zachary Thomas McCauley's motion for disclosure of informants (Doc. No. 16), with opposition by the government (Doc. No. 17), and reply by Defendant (Doc. No. 18). The government also responded to Defendant's reply (Doc. No. 27), to which Defendant then replied. (Doc. No. 28). Also decisional is Defendant's motion to suppress evidence (Doc. No. 23), opposed by the government. (Doc. No. 26).

## II.  BACKGROUND

On March 31, 2017, Toledo Municipal Court Judge Michelle Wagner granted a search warrant for Room 205 of the Quality Inn Hotel located in Toledo, Ohio, occupied by Defendant Zachary Thomas McCauley. (Doc. No. 16-1; Doc. No. 18-1). The warrant was granted based on the affidavit of Toledo Police Detective J. Picking. (Doc. No. 16-1). In the affidavit, Detective Picking stated that during the month of March 2017, he was contacted by two separate confidential sources who each claimed to have observed McCauley in possession of large quantities of cocaine, meth, and heroin in the hotel room. *Id.* at 1. The confidential sources also stated that he was selling the drugs out of the hotel room. *Id.* The first confidential source also stated that he/she had observed McCauley in possession of a large amount of heroin in his Dodge Charger. *Id.*

On March 31, 2017, while conducting surveillance of the Quality Inn, members of the Toledo Police Vice and Bulk Cash units observed McCauley's Dodge Charger. *Id.* at 2. The same day, Detective Picking was contacted by a confidential source who stated he/she could purchase methamphetamine from McCauley in the hotel room. *Id.* Detective Picking met the confidential informant and provided him/her with funds from the Toledo Police Vice Drug Fund to purchase the drugs. *Id.* He/she purchased the drugs in the hotel room and returned the drugs to Detective Picking. *Id.* A field test confirmed the substance purchased was methamphetamine. *Id.* The confidential source also informed Detective Picking that he/she had observed a handgun in the hotel room. *Id.*

After receiving the warrant, officers entered the room. Seized were a scale, a Beretta, 40 caliber pistol, a Walther, 22 caliber pistol, three bags of heroin, methamphetamine, a needle/cap, three cell phones, $110.00 cash, and a wallet with McCauley's ID. (Doc. No. 16-2).

The search also resulted in McCauley's arrest. (Doc. No. 26-2 at 1). Days later McCauley was released on bond on what were then state charges. *Id.* Following his release on April 3, 2017, McCauley reported to his parole officer, Jamie Gentene. *Id.* Gentene had been McCauley's parole officer since November 2014. *Id.*

Gentene and McCauley were the only two individuals present at the April 3, 2017 meeting. *Id.* During the meeting, McCauley admitted to possession of the firearms, heroin, and methamphetamine found in the hotel room. *Id.* He also admitted that he had been selling the drugs and that he had purchased the firearms. *Id.* Following his admission, Gentene asked whether he would like to speak to ATF agents about the purchase of the firearms. *Id.* Gentene states that she did not tell McCauley that, in order to stay out of jail, he was required to talk to federal agents or even make the admissions to her. *Id.* at 1-2. Instead, she maintains that McCauley made the admissions to her as if he getting them off his chest and that he was willing to speak with ATF

2

agents, who were not involved in McCauley's state supervision.  *Id.*  McCauley tells a different story.  (Doc. No. 23-1).

Following the admission, McCauley was not taken into custody but was required to report weekly to Gentene.  (Doc. No. 26-2 at 1-2).  At one of these weekly reporting meetings on April 17, 2017,  McCauley spoke with ATF agents in a conference room at the Adult Parole Office in Toledo.  (Doc. No. 23-1 at 1; Doc. No. 26-1 at 1; Doc. No. 26-2 at 2).  Present in the meeting were McCauley and three ATF agents: Justin Chamberlain, Steve Allick, and Jimmie Pharr.  (Doc. No. 23-1 at 1; Doc. No. 26-1 at 1).  All three agents were in plain clothes and of similar, medium build as McCauley.  (Doc. No. 23-1 at 1; Doc. No. 26-1 at 1).  Although the conference room was in the interior of the building, one wall contained a window looking onto a photocopier in the parole office.  (Doc. No. 26-1 at 1).  The conference room had two doors and contained a conference table and eight chairs.  (Doc. No. 26-1 at 1-2).  During the interview, both doors were shut but at least one of the doors was unlocked.  (Doc. No. 26-1 at 2).  McCauley claims he "could not get to either door without passing an agent."  (Doc. No. 23-1 at 1).  But ATF Agent Chamberlain stated that McCauley "took the seat right next to the door he entered."  (Doc. No. 26-1 at 2).

Prior to the interview, ATF Agent Chamberlain stated that he told McCauley that he was free to leave and could stop the interview and do so at any time.  (Doc. No. 26-1 at 1).  Because McCauley was told he was not in custody and could leave at any time, he was not given his Miranda warnings.  (Doc. No. 26-1 at 1).  During the interview, McCauley admitted possession of the two firearms and disclosed where he had purchased them.  (Doc. No. 26-1 at 2).  Though McCauley revealed the identity of one seller, he would only say that he purchased the Walther .22 caliber from someone on Craigslist.  (Doc. No. 26-1 at 2).  The ATF agents did not press McCauley to name the Craigslist seller after he first declined to do so.  (Doc. No. 26-1 at 2).  At the conclusion of the interview, approximately ten minutes after it commenced, McCauley exited the room.  (Doc. No. 26-

3

1 at 2-3). It was not until six months after the interview that McCauley was taken into custody. (Doc. No. 26-1 at 3).

### III. MOTION FOR DISCLOSURE OF INFORMANTS

Generally, the informer's privilege allows the government to withhold the identity of persons who disclose "their knowledge of the commission of crimes to law-enforcement officials." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). But, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.

To determine whether disclosure is "justifiable," the district court must weigh "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. Specifically, the determination "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* "In analyzing this issue, courts have traditionally utilized *in camera* interviews in order to assess the relevance and possible helpfulness of the informant's identity to the defense." *United States v. Sharp*, 778 F.2d 1182, 1187 (6th Cir. 1985).

Before I may compel disclosure or grant an in camera interview, the defendant must "show how disclosure of the informant would substantively assist his defense." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992); *see also United States v. Ray*, 803 F.3d 244, 274 (6th Cir. 2015) ("A defendant must provide some evidence that disclosure of the informant's identity would assist in his defense before disclosure will be warranted."); *United States v. Sierra-Villegas*, 774 F.3d 1093, 1109 (6th Cir. 2014) ("[A]n in camera hearing is not required when the defendant fails to identify how the informant's testimony could be relevant or helpful."). "Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *Sharp*, 778 F.2d at 1187 (quoting *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979)).

Here, McCauley moves to disclose the identity of three confidential informants. (Doc. No. 16). The first two notified the Toledo Police Department that McCauley was in possession of and selling drugs from Room 205 at the Quality Inn. The third took part in a controlled buy in which the confidential source used funds provided by the Toledo Police Vice Drug Fund to purchase drugs from McCauley in the hotel room. Because of the different roles played by the informants, I will analyze the first two separately from the third.

A.      Confidential Informants 1 & 2

Statements made by the first two confidential informants were used to procure the search warrant. This case is comparable to that of *United States v. Beals*, 698 F.3d 248 (6th Cir 2012). In *Beals*, the confidential informant told the police that he had recently seen contraband in the garage of the defendant. 698 F.3d at 262. Using this information, the police procured a search warrant. *Id.* at 262. Upon search of the defendant's garage, drugs were found along with a handgun that gave rise to two gun convictions – possession of a firearm in furtherance of a drug trafficking crime and being a felon in possession of a firearm. *Id.* at 261-63. Following the search, the defendant moved for disclosure of the informant. *Id.* at 268-69. In denying the motion, the court reasoned that

> the only role the confidential informant played was supplying reliable information to police that led to a fruitful search. The informant did not orchestrate or involve himself in any controlled methamphetamine purchases, supply Ambrose with pseudoephedrine, or sell or lend Ambrose the handgun later found in the garage. The informant helped orchestrate *the search* that led to discovery of incriminating evidence, not the crimes themselves.

*Id.* at 270. The Sixth Circuit has followed this line of reasoning, refusing to disclose the identity of a "mere tipster" who was not "an active participant in the events underlying the defendant's potential criminal liability." *Sharp*, 778 F.2d at 1186 n.2; *see, e.g.*, *United States v. Doxey*, 833 F.3d 692, 707-08 (6th Cir. 2016); *Ray*, 803 F.3d at 274.

Like the confidential informant in *Beals*, the first two confidential informants here made statements to the police that ultimately led to a fruitful search. But McCauley argues that they are more than "mere tipsters." Specifically, he states the two could assist the defense in that they "may

5

have knowledge that permits an inference that someone other than Defendant hid contraband in difficult-to-notice places in the room." (Doc. No. 16 at 5). To support his argument, he asserts that they may know which of the prior tenants of the hotel room could have placed the drugs in the room before McCauley himself rented it. It is true that, in the ten days before the search, five other persons occupied the hotel room. (Doc. No. 18-1). But the first two confidential informants identified not only the room itself as containing contraband, but also McCauley by name and the car he drove. (Doc. No. 16-1).

Because the first two confidential informants provided McCauley's name along with the location, there is no evidence that either would provide relevant information to support the defense that a previous occupant of the room hid the drugs found therein. Any inference that they would be helpful to the defense would be mere speculation insufficient to warrant disclosure of the confidential informants' identities. Therefore, without more, I find the first two confidential informants to be "mere tipsters," whose identities need not be disclosed at this time.

B.  Confidential Informant 3

"Although there is no fixed rule, disclosure has usually been required when, as in *Roviaro,* the informer was an active participant in the events underlying the defendant's potential criminal liability." *Sharp*, 778 F.2d at 1186 n.2. In *Roviaro*, a transaction took place in which the confidential informant picked up the defendant at a prearranged meeting place and drove him to a location chosen by the defendant. 353 U.S. at 57. The defendant then exited the car, retrieved a small package, placed it in the vehicle, and walked away. *Id.* An officer was in the trunk of the vehicle for the duration of the drive. *Id.* at 56-57. The package was found to contain heroin. *Id.* The defendant was subsequently charged with sale of heroin and illegal transportation of narcotics.

On appeal to the Supreme Court, the Court held that the district court had erred in refusing to disclosure the identity of the informant. *Id.* at 65. In so holding, the Court noted that "the Government's informer was the sole participant, other than the accused, in the transaction charged.

The informer was the only witness in a position to amplify or contradict the testimony of government witnesses." *Id.* at 64.

Although the third confidential informant here participated in a controlled buy similar to the informer in *Roviaro*, the circumstances here are somewhat different. Contrary to *Roviaro*, the controlled buy was grounds for the search warrant, not the arrest itself. In other words, McCauley was not charged with sale or illegal transportation of a controlled substance based upon the transaction with the third informant. Rather, he was charged with possession with *intent* to distribute following a search, permitted by a warrant procured in part by the information acquired by the police through this transaction. This presents a bit of a quandary as to whether the third informant was an active participant in McCauley's criminal liability or merely a conduit for the search warrant. To ascertain the extent to which the third informant would be helpful and relevant to preparing the defense, I will conduct an in camera interview approximately 60 days prior to the trial.

IV. MOTION TO SUPPRESS

The Fifth Amendment states that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he Fifth Amendment privilege … serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). McCauley claims that his Fifth Amendment privilege against self-incrimination was violated during the April 17, 2017 interview with ATF agents at the Toledo Parole Authority Office. Specifically, he claims that the interview was a custodial interrogation for which *Miranda* warnings were not given or, alternatively, that the confession was a product of coercion. On these grounds, McCauley argues the confession should be suppressed. (Doc. No. 23). McCauley did not request a hearing on the matter or reply to the government's opposition.

A. *Miranda* warnings

In *Miranda*, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. While "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it," "police officers are not required to administer Miranda warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Instead, "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.*

To determine whether an individual was "in custody," the court must ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). These two questions inform "the ultimate inquiry[:] simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Some factors to consider include:

> (1) the purpose of the questioning;
> (2) whether the place of the questioning was hostile or coercive;
> (3) the length of the questioning; and
> (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the

8

police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted) (naming the following factors: "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning").

Here, from start to finish, the objective circumstances do not evince McCauley was restrained from movement to the degree of formal arrest. McCauley was told at the beginning of the interview that he was not under arrest and was free to end the interview and leave at any time. The interview was conducted in a conference room at the Toledo Adult Parole Authority office, a place McCauley had been multiple times since his parole began three years prior in 2014. The room itself had an interior window, a conference table, approximately eight chairs, and two doors, at least one of which was known to be unlocked throughout the interview although both were closed. Three ATF agents were present for the interview; all in plain clothes, none brandishing a weapon. While McCauley and ATF Agent Chamberlain have different recollections of where each participant in the interview sat, there is no question the McCauley was never restrained during the interview and that after ten minutes, the interview ended and McCauley left the room.

The one remaining factor is McCauley's alleged fear that his continued freedom was dependent on his speaking with ATF agents. McCauley argues that he did not feel he was free to leave the interview, claiming he was required to speak to ATF agents by his parole officer. This claim is contradicted by the parole officer. But I do not find weighing the conflicting statements necessary. The totality of the circumstances lead me to conclude that any subjective fear when entering the interview would not have lead a reasonable person to conclude he was restrained to the degree of formal arrest. From the start of the interview, McCauley's fear should have been extinguished when he was told that he was indeed free to end the interview and leave at any time. It seems that this was the case. Not only did McCauley leave the room after only ten minutes, he also

9

exercised his freedom *during* the interview by declining to answer some of the questions posed. If McCauley had actually believed that he would be punished for refusing the interview, the reasonable inference is that this belief would have extended to the entire interview. McCauley would not have felt he was free to withhold information without the risk of losing his freedom.

In this case, McCauley left the Toledo Adult Parole Authority office in the same manner he arrived, a free man. Given the totality of the circumstances, at no time during the interview was McCauley's freedom restrained to the degree of formal arrest. Because the interview was not a custodial interrogation, *Miranda* warnings were not required and McCauley's statements during the interview may not be suppressed on these grounds.

B.    Voluntariness

"When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *see also Lego v. Twomey*, 404 U.S. 477, 489 (1972). But to find that a confession was involuntary, the court must find,

> (i) the police activity was objectively coercive;
> (ii) the coercion in question was sufficient to overbear the defendant's will; and
> (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

Here, McCauley alleges that the environment and the line of questioning were coercive. But, as noted above, the interview was conducted at a location McCauley had been several times before and held in a room with a conference table, several chairs, an interior window, and two doors, one of which was known to be unlocked. There is nothing inherently hostile or coercive about this environment. Further, McCauley does not allege that he was restrained at any point during the interview or that any of the agents raised their voices, made threats, brandished weapons, or engaged in any other behavior suggesting coercion. Instead, the three agents, dressed in plain clothes, simply questioned McCauley about the firearms found in the Quality Inn hotel room. Though he was a

10

convicted felon, this line of questioning alone, without more, does not evince objectively coercive police tactics.

Because I do not find the any part of the interview to be objectively coercive, the inquiry may end here. But, briefly, even if any conduct by the agents could evince coercion, the second element is not met. Not only did McCauley leave on his own after the interview that lasted a mere ten minutes, he also exercised free will when choosing which questions to answer. Namely, when asked to disclose the name of the person from whom he purchased the second firearm, he declined to do so. The ATF agents did not press McCauley further on the subject, but respected his decision to withhold the information.

As the facts do not arguably suggest that the ATF agents engaged in coercive tactics or that McCauley's will was somehow overborn, the third element certainly has not been satisfied. Therefore, I find that McCauley's confession was not the product of coercion and deny suppression.

## V. CONCLUSION

For the foregoing reasons, McCauley's motion to suppress is overruled. (Doc. No. 23). The motion for disclosure of informants is denied with respect to the first and second confidential informants. I will hold an in camera hearing approximately 60 days before trial to assess whether disclosure of the third confidential informant is warranted.

So Ordered.

                                                                s/ Jeffrey J. Helmick
                                                                 United States District Judge